## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| 1. | **JUSTIN COPELAND,** | ) | |
| 2. | **LAWRENCE MORGAN,** | ) | |
| 3. | **KENNETH SPEED,** | ) | |
| 4. | **JOHN B. SMITH,** | ) | |
| 5. | **BEVERLY DREW,** | ) | |
| 6. | **LEROY KING,** | ) | |
| | | ) | |
| | **Plaintiffs,** | ) | |
| | | ) | |
| **v.** | | ) | **Case No. 15-CV-634-JHP-PJC** |
| | | ) | |
| 1. | **METROPOLITAN TULSA TRANSIT** | ) | |
| | **AUTHORITY,** | ) | |
| 2. | **WILLIAM CARTWRIGHT, in his** | ) | |
| | **official capacity as General Manger of** | | |
| | **Metropolitan Tulsa Transit Authority,** | ) | |
| | **and in his individual capacity, and** | ) | |
| 3. | **MICHAEL COLBERT, in his official** | ) | |
| | **capacity as Operations Manager of** | ) | |
| | **Metropolitan Tulsa Transit Authority,** | ) | |
| | **and in his individual capacity, and** | ) | |
| 4. | **DEBBIE MULKEY, in her official** | ) | |
| | **capacity as Human Resource Director** | ) | |
| | **of Metropolitan Tulsa Transit Authority** | ) | |
| | **and in her individual capacity,** | ) | |
| | **Defendants.** | ) | |

## COMPLAINT

Plaintiffs, Justin Copeland, Lawrence Morgan, Kenneth Speed, John B. Smith, Beverly Drew, and Leroy King, through their attorneys of record Melvin C. Hall and Damario Solomon-Simmons of Riggs, Abney, Neal, Turpen, Orbison & Lewis, for their causes of action herein allege and state as follows:

## NATURE OF THE CASE

This case is about the egregious deprivation of Plaintiffs' constitutional and federal statutory rights. The Fourth Amendment to the United States Constitution prohibits unreasonable

seizures. In this case Plaintiffs were falsely arrested, detained, and imprisoned without probable cause and without due process. While under false arrest, Plaintiffs were threatened with being booked into jail and prosecuted if they did not pay money that the defendants had arbitrarily and discriminatorily deemed that the Plaintiffs owed. The Tenth Circuit Court of Appeals has stated that it is repugnant to the Constitution for government officials to maliciously abuse their positions of trust to induce the criminal justice system to detain and then to prosecute innocent people. This case is a shameful example of government officials misusing their state powers and the criminal justice system in a perverted attempt to accomplish an ulterior purpose for which it was not designed; Defendants William "Bill" Cartwright, Michael Colbert, and Debbie Mulkey misused their powers to extort money from innocent bus drivers who had only done what they had been asked to do -- promote customer service. In order to avoid the humiliation of being booked into jail and prosecuted, three of the plaintiffs, John Smith, Beverly Drew and Leroy King, paid the money, in cash, which the defendants coerced from them under the color of law.  However, Justin Copeland, Lawrence Morgan, and Kenneth Speed either refused to pay or could not pay the money demanded of them, and they were booked into jail and prosecuted for embezzlement. The Tulsa County District Court dismissed the charges filed against them. Defendants unlawfully and unconstitutionally used the criminal justice system, not to seek justice, but to extort money from innocent bus drivers who had done nothing wrong.

In addition to depriving Plaintiffs of their Fourth Amendment Constitutional Rights, Defendants also deprived Plaintiffs of their liberty interest by publishing knowingly false and defamatory accusations that the Defendants were guilty of stealing and embezzling money from the Metro Tulsa Transit Authority.

The constitutional and federal statutory rights of these six black bus drivers matter. Consequently, Plaintiffs are seeking redress, actual damages, compensatory damages and punitive damages for racial discriminatory discharge, as prohibited by 42 U.S.C. § 1981; false arrest/false imprisonment, as prohibited by the Fourth Amendment to the U.S. Constitution; malicious prosecution, as prohibited by the Fourteenth Amendment to the U.S. Constitution; the deprivation of their liberty interest in their good name and reputation in violation of the Fourteenth Amendment to the U.S. Constitution; conspiracy to interfere with their civil rights; and state law claim of failure to pay wages, in violation of 40 Okla. Stat. § 165.3.

### JURISDICTION AND VENUE

1.       The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 1343, and 1367, conferring original jurisdiction on this court of any civil action arising under the Constitution, the deprivation of Plaintiffs' rights and privileges as citizens of the United States and supplemental jurisdiction of Plaintiffs' state law 40 Okla.Stat. § 165.3 failure to pay wages claim.

2.       Venue is proper in the Northern District of Oklahoma pursuant to 28 U.S.C. § 1391, as all events described in this Complaint took place in the Northern District of Oklahoma, and all parties reside or are located within the Northern District of Oklahoma.

### PARTIES

3.       Plaintiff, Justin Copeland ("Copeland"), is a citizen of the United States. Copeland is a resident of Osage, Tulsa County, State of Oklahoma. Copeland worked for MTTA as a Bus Operator for over twelve years, from September 6, 2002 until November 25, 2014. Copeland is a black male.

4.       Plaintiff, Lawrence Morgan ("Morgan"), is a citizen of the United States. Morgan is a resident of Tulsa, Tulsa County, State of Oklahoma. Morgan worked for MTTA as a Bus

Operator for almost five years, from June 1, 2010 until November 25, 2014. Morgan is a black male.

5.      Plaintiff, Kenneth Speed ("Speed"), is a citizen of the United States. Speed is a resident of Tulsa, Tulsa County, State of Oklahoma. Speed worked for MTTA as a Bus Operator for over twenty-five years, from August 8, 1989 until November 25, 2014. Speed is a black male.

6.      Plaintiff, John B. Smith ("Smith"), is a citizen of the United States. Smith is a resident of Tulsa, Tulsa County, State of Oklahoma. Smith worked for MTTA as a Bus Operator for almost seven years, from April 21, 2008 until November 25, 2014. Smith is a black male.

7.      Plaintiff, Beverly Drew ("Drew"), is a citizen of the United States. Drew is a resident of Tulsa, Tulsa County, State of Oklahoma. Drew worked for MTTA as a Bus Operator for almost ten years, from January 1, 2005 until November 25, 2014. Drew is a black female.

8.      Plaintiff, Leroy King ("King"), is a citizen of the United States. King is a resident of Muskogee, Muskogee County, State of Oklahoma. King worked for MTTA as a Bus Operator for almost eight years, from January 22, 2007 until November 25, 2014. King is a black male.

9.      Defendant, Metro Tulsa Transit Authority ("MTTA"), is a public trust, the sole beneficiary of which is the City of Tulsa, Tulsa County, State of Oklahoma, pursuant to Ordinance tit. 39, ch.9 (2009); see also 60 Okla.Stat. §§ 179-80. The City of Tulsa is a municipal corporation. The MTTA is a "political subdivision" of the state as defined in the Governmental Tort Claims Act, 51 Okla.Stat. § 152(10)(d). The MTTA's general manager reports to a board of trustees appointed by the mayor of the City of Tulsa. The MTTA is primarily concerned with transportation within the City of Tulsa.

10.      Defendant, William Cartwright ("Cartwright"), is the General Manager and final policymaker of the MTTA, and served in that capacity at the time Plaintiffs were discriminatorily

terminated, falsely arrested, maliciously prosecuted, deprived of their liberty interest without due process of law, and had their lawful wages withheld. Cartwright is named in his individual capacity due to his personal involvement in the deprivation of Plaintiffs' constitutional and federal statutory rights. The MTTA is liable to Plaintiffs because Cartwright, as the General Manager and final policymaking authority for the MTTA, officially sanctioned the deprivations of Plaintiffs' constitutional and statutory rights.

11.     Defendant, Michael Colbert ("Colbert"), is the Operations Manager of the MTTA, and served in that capacity at the time Plaintiffs were discriminatorily terminated, falsely arrested, maliciously prosecuted, deprived of their liberty interest without due process of law, and had their lawful wages withheld. Colbert is named in his individual capacity due to his personal involvement in the deprivation of Plaintiffs' constitutional and federal statutory rights.

12.     Defendant, Debbie Mulkey ("Mulkey"), is the Human Resource Director of the MTTA, and served in that capacity at the time Plaintiffs were discriminatorily terminated, falsely arrested, maliciously prosecuted, deprived of their liberty interest without due process of law, and had their lawful wages withheld. Mulkey is named in her individual capacity due to her personal involvement in the deprivation of Plaintiffs' constitutional and federal statutory rights.

## **FACTUAL ALLEGATIONS**

13.     All of the Plaintiffs are black, and were successfully employed for many years as bus drivers for the MTTA, and all of the Plaintiffs were fully trained and experienced bus drivers.

14.     In January 2009, the MTTA, in an effort to improve customer satisfaction with its fixed route bus service, started allowing its Bus Operators (also known as "bus drivers") to issue a 2 Ride Courtesy Pass to customers who had received poor customer service from the MTTA.

15.     At the time the 2 Ride Courtesy Pass program was implemented, the MTTA defined "poor customer service" to mean a delay of 30 minutes or more, but it could also include a circumstance where the bus driver felt that MTTA's fixed route system dissatisfied the customer in a significant way or circumstances where the bus driver felt a customer deserved special consideration due to a mistake on MTTA's part.

16.     On January 8, 2009, Operations Manager Michael Colbert wrote in a memo to the Bus Operators: "This new procedure will allow our **coach operators to make customer services decisions on the spot**. It will be up to you to see that certain individuals do not abuse this new procedure. Our hope is that our customers will recognize and appreciate our efforts to deliver superior service." (Emphasis added).

17.     None of the Plaintiffs had ever been warned, counseled, or disciplined for abusing the 2 Ride Courtesy Pass program or for administering the 2 Ride Courtesy Pass program improperly, unethically, or unlawfully. Plaintiffs were all told that the 2 Ride Courtesy Passes were to be used to diffuse situations with customers, to correct errors, or to placate a customer if the customer had to wait a while. The bus drivers were given discretion as to how to administer the 2 Ride Courtesy Passes.

18.     All Plaintiffs received a copy of the MTTA Operator/Mechanic Employee Handbook ("Handbook"), and the Handbook is **totally devoid of any instructions, limitations, or restrictions** on how many 2 Ride Courtesy Passes can be printed off; when the 2 Ride Courtesy Passes can be printed; or how many 2 Ride Courtesy Passes the bus drivers can possess or dispense. In fact, nowhere in the Handbook is the 2 ride Pass discussed or mentioned.

19.     None of the bus drivers, including the Plaintiffs, received any training as to how many 2 Ride Courtesy Passes can be printed off before the start of a shift, during the shift, or after

the shift. No MTTA bus drivers, including the Plaintiffs, received any training as to when or how many 2 Ride Courtesy Passes could be passed out to customers.

20.     MTTA's Bus Operators Training Manual ("Training Manual") briefly mentions the 2 Ride Courtesy Pass as follows in its entirety: "A 2 Ride pass can be issued by the driver if the bus is delayed for 30 minutes or longer and it is our fault for the delay. You can do this by pressing the *3 buttons, <u>Clear this with dispatch before you issue any 2 Ride cards."</u>

21.     Significantly, the Training Manual is totally devoid of any instructions, limitations, or restrictions on how many 2 Ride Courtesy Passes can be printed off; when the 2 Ride Courtesy Passes can be printed; or how many 2 Ride Courtesy Passes the bus drivers can possess or dispense.

22.     Only Plaintiff Morgan was hired after MTTA implemented the usage of 2 Ride Courtesy Passes and Morgan is the only Plaintiff who even received a Training Manual.

23.     However, neither Morgan nor any of the other of the Plaintiffs were ever trained to clear anything with dispatch before issuing a 2 Ride Courtesy Pass. Occasionally some bus drivers did contact dispatch, but it was not done every time or by every bus driver.

24.     Documents produced by MTTA to the Oklahoma Employment Security Commission ("OESC") and Tulsa Police Department ("TPD") show that there were bus drivers who printed off as many and, in some instances more, 2 Ride Courtesy Passes as Plaintiffs, but unlike Plaintiffs, they were not discriminatorily terminated, falsely arrested, maliciously prosecuted, deprived of their liberty interest without due process of law, nor were their wages withheld.

25.     To date, no other MTTA Bus Driver has been disciplined or terminated for activities related to the 2 Ride Courtesy Pass program or for administering the 2 Ride Courtesy Pass program improperly, unethically, or unlawfully.

26.    The 2 Ride Courtesy Passes do not have any monetary value. Nowhere in MTTA's Training Manual or Handbook  is there a monetary value associated with the 2 Ride Courtesy Passes. In fact, the key pad functions diagram in the back of the Training Manual show a button that says "free ride promotional." Plaintiffs were never told that the 2 Ride Courtesy Passes had any monetary value. Plaintiffs instead were told that the 2 Ride Courtesy Passes were complementary and were to be given away to customers to promote customer satisfaction and contentment with MTTA services.

27.    The Defendants have alleged that the week before November 24, 2014, a MTTA bus driver, Paul Brown, reported that a passenger known as "Country" had in his possession an abundance of 2 Ride Courtesy Passes. The Defendants have further alleged that a review of the 2 Ride Courtesy Passes printed by all bus drivers for the previous four months was conducted, and it was determined that six of the eighty-plus bus drivers employed by MTTA had generated an unusually high number of complementary 2 Ride Courtesy Passes.

28.    The Defendants have alleged that the "investigation" revealed that the six Plaintiffs printed  passes with an alleged value of $40,761.00. In order to coerce money from the Plaintiffs, MTTA fraudulently assigned a monetary value to its admittedly complimentary (free)  2 Ride Courtesy Passes to justify accusing Plaintiffs of embezzlement.

29.    Significantly, the review also revealed that the 2 Ride Courtesy Passes are not assigned individual serial numbers, and there is no way of determining how many of the passes generated were remitted for rides, thereby resulting in an actual dollar loss to the MTTA. Defendants nevertheless met, agreed, and conspired to assert that the Plaintiffs had stolen and embezzled 2 Ride Courtesy Passes which resulted in a financial loss to MTTA in excess of $40,000. However, the only information MTTA actually had was that these six black bus drivers

had generated or printed off a number of 2 Ride Courtesy Passes that MTTA arbitrarily and discriminatorily determined to be abnormally high and above average.

30.     MTTA had <u>not</u> previously established what would constitute an abnormally high and above-average number of printed 2 Ride Courtesy Passes. In addition, throughout the five-year existence of the program, Defendants had apparently failed to monitor the printing of the 2 Ride Courtesy Passes by its bus drivers. Defendants also incompetently failed to provide its bus drivers with any training, guidance or instructions as to how many complementary 2 Ride Courtesy Passes could, or should, be printed. Consequently, Defendants met, agreed, and conspired to make these six black bus drivers the scapegoat by accusing them of stealing 2 Ride Courtesy Passes. Defendants met, agreed, and conspired to pervert the criminal justice system to coerce these six black bus drivers to make "restitution" of the money they allegedly stole by merely printing off the complementary 2 Ride Courtesy Passes. The MTTA did <u>not</u> suffer a financial loss because the 2 Ride Courtesy Passes are complimentary (free), have no face value, cannot be redeemed for cash, and are designed specifically to be given to customers to promote customer satisfaction. Most significantly, Defendants <u>never</u> had any information or evidence that Plaintiffs ever stole, sold, or personally profited from printing off 2 Ride Courtesy Passes that MTTA arbitrarily and discriminatorily believed to be an abnormally high and above average amount.

**<u>Plaintiff John Smith</u>**

31.     John Smith, on November 24, 2014, was at work driving when MTTA supervisor Gerald Herring ("Herring") met Smith at a bus stop and informed Smith that he "was wanted back at the office." Herring exchanged his company van for Smith's bus and Smith headed to MTTA.

32.     MTTA employee Mike Morrison ("Morrison") met Smith at the MTTA door, and told Smith that he was wanted in Colbert's office. Morrison did not tell Smith why Smith was wanted in Colbert's office before Smith walked to Colbert's office.

33.     Smith and Morrison entered Colbert's office which contained Colbert, Julia Butler ("Butler"), Mulkey, David Sanchez ("Sanchez") then vice-president of the MTTA Union ("Union"), and Cartwright, who appeared via interoffice intercom.

34.     Upon entering Colbert's office, Smith inquired, "What's going on?" and Colbert answered, "Wait a minute, we are about to do due process hearing." Shortly thereafter Camilla Hunter ("Hunter"), then President of the Union, entered Colbert's office and requested a moment to speak with Smith to explain to Smith what the meeting was about.

35.     Smith, Hunter, and Sanchez walked outside of Colbert's office, and Hunter informed Smith that he would be terminated and arrested at the conclusion of the meeting with Colbert, Butler, and Mulkey. Significantly, Hunter had this information and was able to inform Smith of the outcome of Smith's "due process hearing" prior to the holding of the hearing.

36.     After meeting with Hunter and Sanchez, Smith returned to Colbert's office and was accused of stealing 2 Ride Courtesy Passes by Colbert.

37.     Smith adamantly denied any wrongdoing, and was told to go to the conference room while Colbert discussed the issue with the others in his office.

38.     While detained at MTTA, a Tulsa Police Department ("TPD") detective told Smith that if he paid $1,008.00 within an hour (cash only), he would not go to jail. The TPD detective who told Smith to pay or go to jail stated that she was acting on behalf of the MTTA's General Manager, William Cartwright. In fact, Smith heard Cartwright smugly and arrogantly state to the

TPD detective that Smith "must pay cash, no checks or credit cards, cash only. If he doesn't pay, arrest him."

39.     Smith was petrified. He had never before been arrested and could not bear the thought of going to jail for a crime he did not commit. He called and informed his mother, Linda Smith ("Mrs. Smith"), that he needed the $1,008.00 to avoid going to jail.

40.     During Smith's phone call with his mother, the TPD detective asked to speak with Mrs. Smith and informed Mrs. Smith that Smith was going to "jail for stealing and selling bus passes on the street unless she [Mrs. Smith] brought $1,008 to MTTA within an hour."

41.     Mrs. Smith was shocked, confused, and devastated to hear that her son was being arrested for stealing and was willing to do whatever necessary to stop Smith from being taken to jail.  Mrs. Smith agreed to bring in the $1,008, but explained that it would be impossible for her to go to the bank to withdraw the $1,008 and bring it to MTTA within an hour. So, Mrs. Smith inquired if she could she pay the $1,008 payment by personal check. The TPD detective informed Mrs. Smith that Cartwright required that the payment of $1,008 be paid by cash only.

42.     Knowing that his mother could not make it in time to pay what was essentially an extortion payment, Smith called his friend, Mr. Clarence Shelton ("Shelton"), and informed Shelton that Smith had been arrested and detained on charges of embezzlement and needed Shelton to bring him the demanded $1,008.00 payment, in cash, within the hour in order to avoid being taken to jail. Hunter volunteered to pick up Shelton, take Shelton to the bank, and bring Shelton to MTTA.

43.     In addition to extreme fear and emotional distress due to being terminated, falsely arrested, threaten with jail, and extorted out of $1,008.00, Smith was thoroughly embarrassed and

distraught because he was forced to involve multiple third-parties and forced to borrow money from said third-parties.

44.     Shelton arrived at MTTA and paid Smith's $1,008.00 extortion payment.

45.     In addition to being coerced under the threat of being jailed, Smith was also forced to sign a letter which stated:

> In lieu of prosecution and arrest on charges of embezzlement in the amount of $1,008.00, Mr. John Smith agrees to pay restitution for this entire amount to the Metropolitan Tulsa Transit Authority (MTTA).
>
> MTTA agrees to accept receipt of the full restitution amount and not press criminal charges against Mr. Smith.
>
> Both Parties agree that Mr. Smith is hereby terminated from his employment at MTTA for cause and therefore does not qualify for State of Oklahoma unemployment benefits from his employment at MTTA.

46.     After Smith paid the money and signed the above letter, Cartwright told Smith that "he was terminated and had no more business with MTTA."

**Plaintiff Beverly Drew**

47.     Beverly Drew was on a scheduled day off on November 24, 2014, when she was called into MTTA by Morrison. Once she arrived at MTTA, Drew was placed in a conference room with Speed and Copeland and was not informed why she was summoned.

48.     After waiting in the conference room for approximately fifteen minutes, Drew was called into Colbert's office which contained Butler, Colbert, Hunter, Mulkey, and Cartwright (who appeared via interoffice intercom), and informed that she was accused of stealing 2 Ride Courtesy Passes.

49.     Drew adamantly denied any wrongdoing. Colbert told Drew to go back to the conference room while those present discussed the issue. Colbert informed Drew that he would summon her back to his office after their deliberations.

50.     Butler instructed Drew that she could not leave MTTA while the allegations were discussed and not to discuss the issue with anyone.

51.     After approximately one hour, Butler came to the conference room and told Drew she was going to jail and walked Drew to the front of the building where two female TPD detectives were waiting for Drew.

52.     The TPD detectives told Drew to put her hands behind her back and that she was being arrested for embezzlement. Drew, who had never before had any negative interaction with the police, was handcuffed, "perp walked out of MTTA" in front of onlookers and co-workers, including Cartwright. Drew heard Cartwright shout, "Take her to jail!" The police threw Drew into a marked cruiser, and transported her to the Downtown Tulsa Police Station ("TPD Station") like a violent criminal.

53.     While at the TPD Station, a male Tulsa Police detective told Drew that if she paid $1,001.00 within an hour (cash only), she would not go to jail. The TPD detective who told Drew to pay or go to jail stated that she was acting on behalf of the MTTA's General Manager, Bill Cartwright.

54.     A petrified Drew, who had never before been arrested before, was just a few days removed from a serious eye surgery and weak from being denied food and her daily medication while MTTA falsely arrested and imprisoned her. She could not bear the thought of going to jail.

55.     So, Drew called and reluctantly informed her son, Thomas Drew ("Mr. Drew") that she had been arrested and detained on charges of embezzlement and needed Mr. Drew to bring $1,001.00 (cash only) to the TPD Station within the hour in order for her avoid being taken to jail.

56.     Mr. Drew arrived at the TPD Station and personally placed the $1,001.00 in the hand of Cartwright, who counted the money and authorized TPD to release Drew from custody.

57.     Drew's extreme fear and emotional distress due to being arrested, threatened with jail, and extorted out of $1,001.00 was exacerbated by the embarrassment of being forced to involve her son and borrow money to pay the extortion payment.

58.     In addition to being coerced under the threat of being jailed, Drew was also forced to sign a letter which stated:

> In lieu of prosecution and arrest on charges of embezzlement in the amount of $1,001.00, Ms. Beverly Drew agrees to pay restitution for this entire amount to the Metropolitan Tulsa Transit Authority (MTTA).

> MTTA agrees to accept receipt of the full restitution amount and not press criminal charges against Ms. Drew.

> Both Parties agree that Ms. Drew is hereby terminated from her employment at MTTA for cause and therefore does not qualify for State of Oklahoma unemployment benefits from her employment at MTTA.

59.     After Drew paid the money and signed the above-described letter, MTTA called Drew to return to MTTA and told her that she was officially fired.

**Plaintiff Leroy King**

60.     Plaintiff, Leroy King, on November 24, 2014, was called into MTTA by Morrison. Once King arrived at MTTA, King was placed in a room and was not informed why he was summoned.

61.     After waiting in the room for approximately two hours, King was called into a room with Colbert, Morrison, Butler, Hunter, and Cartwright (who appeared via interoffice intercom) and accused of stealing 2 Ride Courtesy Passes.  King adamantly denied any wrongdoing and was sent back to the conference room.

62.     King was then summoned back to Colbert's office. Upon entering Colbert's office, King was handcuffed, arrested, "perp walked" out of MTTA, thrown into a marked police cruiser, and transported to the TPD Station like a violent criminal.

63.     While at the TPD Station, a TPD detective told King that if he paid $966.00 within an hour, he would not be booked and jailed. King advised the TPD detective that he could pay the $966 with a credit card, but he was told that MTTA would only accept cash. The TPD detective who told King to pay or go to jail stated that she was acting on behalf of MTTA's General Manager, Bill Cartwright.

64.     In between pay periods and without $966.00 available in his bank account, to avoid being booked and jailed, King was forced to call his now deceased mother, Eddie King ("E. King") to make travel arrangements from Muskogee, Oklahoma so she could deliver the demanded cash to Cartwright at the TPD Station.

65.     Because his mother was elderly and sick, King also had to call his wife Teresa King ("T. King") and have T. King abruptly take off work, go pick-up and drive E. King to the bank, and then speed against the clock to get to the TPD Station in time to save King from being jailed.

66.     Upon arriving to the TPD Station, T. King was directed to pay the $966.00 extortion payment directly to Cartwright, who then authorized TPD to release King from custody.

67.     In addition to being coerced into paying $966.00 in cash to avoid being placed in a jail cell, King was also forced to sign a termination letter.

68.     King also did not receive his final paycheck until some 3 months later, in January 2015.

**Plaintiff Justin Copeland**

69.     Justin Copeland was on vacation on November 24, 2014, but nonetheless was called into MTTA by Morrison. Once he arrived at MTTA, Copeland was placed in a conference room with Speed and Drew and was not informed why he was summoned.

70.     After waiting in the conference room for approximately two hours, Copeland was called into Colbert's office which contained Butler, Colbert, and Hunter. Colbert accused Copeland of stealing 2 Ride Courtesy Passes.

71.     Copeland adamantly denied any wrongdoing and Colbert told Copeland to go back to the conference room while those present discussed the issue. Colbert informed Copeland that he would summon Copeland back to his office after their deliberations.

72.     After waiting in the conference room for approximately one hour, Copeland was escorted over to the front of MTTA, and directed into a room where Copeland encountered two TPD detectives who told Copeland he was under arrest.

73.     In his 60 years, Copeland had never heard those words directed at him and was shocked. He asked why he was being arrested.  One of the TPD detectives stated he was being arrested for stealing and selling 2-Ride Passes, and one of the TPD detectives told Copeland to put his hands behind his back and for the first time in his life Copeland was handcuffed.

74.     While handcuffed so tightly that his wrists were bruised, Copeland was "perp walked" out of MTTA in front of onlookers and co-workers, including Cartwright. Copeland observed that Cartwright was in a rage and heard Cartwright scream, "Lock him up, lock all of them up!"

75.     Copeland was then transported in a marked TPD cruiser to TPD Station like a violent criminal.

76.     Upon arriving at TPD Station, Copeland was chained to a bench, alone in a room for approximately fifteen minutes, during which time he was overcome with fear, disbelief, and confusion.

77.     TPD Detective Debbie Crisp ("Crisp") then interrogated Copeland for approximately one hour, during which time Copeland was still in shock and confused that he was falsely arrested for doing the job he loved and was asked to do.

78.     During the interrogation, Crisp informed Copeland that if he paid $4,391, in cash, to MTTA within one hour he would not be booked into jail. Crisp told Copeland that she was acting on behalf of MTTA's General Manager, Bill Cartwright, in making the offer to Copeland to pay $4,391to avoid being booked into jail.

79.     Copeland could not afford to pay MTTA's extortion payment to avoid jail, and consequently was booked into jail which caused him to suffer the humiliation of being stripped naked, the shame of enduring body cavity searches, and the embarrassment of having mug shots taken that he knew the world would see. Significantly, as revealed in Cartwright's statement to the TPD, Copeland was not accused of stealing 2 Ride Courtesy Passes, but of fraudulently printing 2 Ride Courtesy Passes:

PC AFFIDAVIT: COPELAND, JUSTIN W.

On 11/24/2014 the general manager at Metropolitan Tulsa Transit Authority reported to the Tulsa Police Department that employee (Justin Copeland) embezzled $4,392.50 from their company. Copeland fraudulently printed off bus coupon from the Fair Box System between Aug. 1, 2014 thru November 22, 2014. The total fraudulent coupons printed were 1,255.

The company had a financial loss of $4,392.50 from coupons embezzled by Copeland.

Video available showing Copeland printing off coupons.

D.R. Crisp, TPD DET

17

80. Subsequently, Copeland had to spend thousands of dollars to be bonded out of jail and retain a criminal attorney to fight the bogus charges.

81. Numerous media outlets, television, radio, print, and social media reported that six Tulsa bus drivers were fired for stealing and embezzling 2 Ride Courtesy Cards. It was specifically reported that the Plaintiffs were printing out bus passes, selling them on the side at half price, and pocketing the money. The media would not have known of these accusations without MTTA providing these allegations to the media. MTTA had absolutely no information or evidence that these bus drivers had stolen or embezzled fares; however, MTTA published such knowingly false information to the media and allowed the media to continuously and repeatedly publish scandalous allegations that MTTA knew to be patently false.

82. Because Copeland was arrested and booked into jail, his picture and name were published in the media reports. Tulsa's Fox23 News even went to Copeland's house and knocked on his door. Copeland did not answer the door, but that did not stop Fox23 from broadcasting live in front of Copeland's home while Copeland, feeling like a prisoner in his own home, looked on in shock and disbelief.  In addition, Copeland's neighbors witnessed the media activity outside his home.

83. Copeland did not receive any due process of any kind whatsoever prior to being terminated, arrested, detained, and confined.

**Plaintiff Kenneth Speed**

84. Kenneth Speed arrived at work at 4:15 a.m. on November 24, 2014, ready to start his usual shift. At that time Al Garcia, an MTTA Dispatcher, told Speed was told he was "out of

service"[1], and to go home. Al Garcia also informed Speed that Speed was to report back to MTTA by 8:00 am.

85.     Speed came back to MTTA, as instructed, at 8:00 am, and was placed in a conference room with Copeland and Drew. He was not informed why he was summoned.

86.     After waiting in the conference room for approximately one hour, Speed was called into Colbert's office which contained Colbert, Hunter, Mulkey, and Butler. Colbert accused Speed of stealing and selling 2 Ride Courtesy Passes.

87.     Speed adamantly denied any wrongdoing, and Colbert told Speed to go back to the conference room while those present discussed the issue. Colbert informed Speed that he would summon Speed back to his office after their deliberations.

88.     After waiting in the conference room for approximately thirty minutes, Speed was ordered to the front of MTTA. While walking with Speed, Hunter informed Speed that MTTA was going to have him arrested.

89.     Speed was then directed into a room where Speed encountered two TPD detectives who told Speed he was under arrest. One of the TPD detectives stated Speed was being arrested for stealing and selling 2 Ride Passes, and another TPD detective handcuffed Speed behind his back.

90.     After providing over twenty-five years of service to MTTA, Speed was "perp walked" out of MTTA in front of onlookers and co-workers, and TPD detectives transported Speed in a marked TPD cruiser to the TPD Station like a violent criminal.

---

[1] Based upon information and belief, when MTTA places a bus driver "Out of Service," that driver cannot work until further notice.

91.     Upon arriving at the TPD Station, TPD Detective Carmen Brown-Hill ("Brown") interrogated Speed for approximately one hour, during which time Speed was shocked, dazed, and confused that he was falsely arrested for doing the job he loved and was asked to do.

92.     During the interrogation, Brown informed Speed that if he paid $31,188.50, in cash, to MTTA within one hour he would not be booked into jail. Brown told Speed that she was acting on behalf of MTTA's General Manager, Bill Cartwright, in making the offer to Speed to pay $31,188.50 to avoid being jailed.

93.     Speed could not afford to pay MTTA's extortion payment to avoid jail, and consequently was booked into jail which caused him to suffer the humiliation of being stripped naked, the shame of enduring body cavity searches, and the embarrassment of having mug shots taken that he knew the world would see. Significantly, as revealed in Cartwright's statement to the TPD, Speed was not accused of stealing 2 Ride Courtesy Passes, but of fraudulently printing 2 Ride Courtesy Passes:

PC AFFIDAVIT [KENNETH SPEED]

On 11-24-14 officers were called to Tulsa Transit located at 515 S. Rockford. Reference subject in custody for embezzlement. Upon arrival suspect, Kenneth Speed, was transported to Detective Division where he was interviewed by detectives. Tulsa Transit General Manager, William Cartwright, reported the employee Kenneth Speed, embezzled $31,188.50 from their company. Speed fraudulently printed off bus coupons from the Fair Box System between Aug 1st, 2014 thru November 22nd, 2014. The total fraudulent coupons printed were 8,911. The company suffered a loss of $31,188.51 from fraudulent printing of coupons. Company provided video showing Speed printing off coupons with no bus passengers in site. Upon interviewing Speed he admitted to printing off coupons but denied knowing he was doing anything wrong.

T. Means, TPD, GID

94.     Subsequently, Speed had to spend thousands of dollars to be bonded out of jail and retain a criminal attorney to fight the bogus charges.

20

95.     Numerous media outlets, television, radio, print, and social media reported that six Tulsa bus drivers were fired for stealing and embezzling 2 Ride Courtesy Cards. It was specifically reported that the Plaintiffs were printing out bus passes, selling them on the side at half price, and pocketing the money. <u>The media would not have known of these allegations unless MTTA provided these accusations to the media</u>. MTTA had absolutely no information or evidence that these bus drivers had stolen or embezzled fares: however, MTTA published such knowingly false information to the media and allowed the media to continuously and repeatedly publish scandalous allegations that MTTA knew to be patently false.

96.     Because Speed was arrested and booked into jail, his picture and name were published in the media reports.

97.     Speed did not receive any due process of any kind whatsoever prior to being terminated, arrested, detained, and confined.

### **Plaintiff Lawrence Morgan**

97.     On November 24, 2014, Lawrence Morgan was called into MTTA by Morrison. Once he arrived at MTTA, Morgan was placed in a conference room by himself for approximately thirty minutes without being told why he had been summoned.

98.     Hunter and Sanchez entered the conference room with Morgan and stated, "You are more than likely going to be arrested." In response, Morgan asked, "Arrested for what?" Hunter told Morgan that MTTA alleged that he owed more than $2,000 to MTTA, but if he paid the $2,000 he could avoid going to jail.  Significantly, Hunter was able to advise Morgan of the outcome of the "due process hearing" before the hearing was held.

99.     Morgan called his wife, Mishka Morgan, and informed her that he did not know why, but that according to Hunter, MTTA was going to have him arrested and to get money ready for a bail bondsmen.

100.    Hunter told Morgan that MTTA stated Morgan could not leave the conference room until MTTA summoned Morgan. Morgan was in the conference room in the conference room for approximately twenty minutes.

101.    Hunter returned to the conference room and instructed Morgan to follow her into Colbert's office for a "due process hearing." Inside Colbert's office were Colbert, Hunter, Mulkey, Butler, and Sanchez. Colbert accused Morgan of stealing and selling 2-Ride Courtesy Passes.

102.    Morgan adamantly denied any wrongdoing and Colbert told Morgan to go back to the conference room while those present discussed the issue. Colbert informed Morgan that he would summon Morgan back to his office after their deliberations.

103.    After waiting in the conference room for approximately thirty minutes, Butler instructed Morgan to walk with her to the front of MTTA.  While walking with Morgan, Butler informed Morgan there were two TPD officers who wanted to speak with him.

104.    Butler led Morgan into a room which contained one female and one male TPD officer. The officers stated, "We are taking you downtown to be questioned." Confused and shocked, Morgan asked the officers, "Are you taking me to jail?"  One of the officers replied, "It depends on what you say," and then slapped handcuffs on Morgan behind his back.

105.    After providing almost five years of service, Morgan was "perp walked" out of MTTA in front of onlookers and co-workers, including Cartwright, and transported in a marked TPD cruiser to the TPD Station like a violent criminal.

106.    Upon arriving at the TPD Station, TPD Detective Brown interrogated Morgan for approximately one hour. During the interrogation, Brown informed Morgan if he paid $2,205.00, in cash, to MTTA within one hour he would not be booked into jail. Brown told Morgan that she was acting on behalf of MTTA's General Manager, Bill Cartwright, in making the offer to Morgan to pay $2,205.00 in order to avoid being jailed.

107.    Morgan asked Brown, "Really, so I am being arrested for doing my job?" In response, Brown stopped the interrogation and left the room for approximately ten minutes. Brown returned with another female TPD officer that appeared to be Brown's supervisor. The unknown female TPD officer told Morgan that he was being arrested because he was "excessive in printing off 2-Ride Courtesy Passes."

108.    Brown then reminded Morgan that if he paid the $2,205.00 to Cartwright within the hour, that Cartwright would instruct TPD to let Morgan go.

109.    Morgan could not afford to pay MTTA's extortion payment to avoid jail, and consequently was booked into jail which caused him to suffer the humiliation of being stripped naked, the shame of enduring body cavity searches, and the embarrassment of having mug shots taken that he knew the world would see. Significantly, as revealed in Cartwright's statement to the TPD, Morgan was not accused of stealing 2 Ride Courtesy Passes, but of fraudulently printing 2 Ride Courtesy Passes:

P.C. AFFIDAVIT: [LAWRENCE MORGAN]

On 11-24-14 William Cartwright, General Manager for Tulsa Transit reported the employee, Lawrence Morgan embezzled $2,205.00 from their company. Morgan fraudulently printed off bus coupons from the Fair Box System between Aug 1st, 2014 and Nov 22, 2014. The total amount of fraudulent coupons printed were 630. The company suffered a financial loss of $2,205.00 from fraudulent printing of coupons. Company provided video showing Morgan printing off coupons with no bus passengers in sight. Upon interviewing Morgan, he admitted to printing off

coupons but denied knowing he was doing anything wrong. He stated he was trained this way when hired by Tulsa Transit.

T Means, TPD, GID

110.     Subsequently Morgan had to spend thousands of dollars to be bonded out of jail and retain a criminal attorney to fight the bogus charges.

111.     Numerous media outlets, television, radio, print, and social media reported that six Tulsa bus drivers were fired for stealing and embezzling 2 Ride Courtesy Cards. It was specifically reported that the Plaintiffs were printing out bus passes, selling them on the side at half price, and pocketing the money. The media would not have known of these allegations without MTTA providing these accusations to the media. MTTA had absolutely no information or evidence that these bus drivers had stolen or embezzled fares; however, MTTA published such knowingly false information to the media and allowed the media to continuously and repeatedly publish scandalous allegations that MTTA knew to be patently false.

112.     Because Morgan was arrested and booked into jail, his picture and name were published in the media reports.

113.     The next day, Tuesday November 25, 2014, Morgan returned to MTTA to retrieve his last paycheck for wages and benefits earned through November 24, 2014. Colbert informed Morgan that his last paycheck would be available by Friday November 28, 2015.

114.     MTTA did not pay Morgan the wages and benefits owed him until on or around May 11, 2015.

115.     Morgan did not receive any due process of any kind whatsoever prior to being terminated, arrested, detained, and confined.

**The Felony Embezzlement Criminal Charges Against
Plaintiffs Copeland, Speed, & Morgan Were Dismissed**

116.   On December 12, 2014, felony criminal charges of embezzlement by employee under 21 Okla.Stat. § 1456[2] were filed against Plaintiffs Copeland, Speed, and Morgan in the District Court in and for Tulsa County- case number CF-2014-6183 stating:

**(COUNT 1)
21 O.S. 1456**

**JUSTIN W COPELAND,** between **8/1/2014** and **11/24/2014**, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **EMBEZZLEMENT BY EMPLOYEE**, a Felony, by unlawfully, feloniously, said defendant, not being an apprentice, nor a person within the age of 18 years, and being then and there the employee of Mtta Bus Company, was entrusted with the sum of; $4,392.50, lawfully received from one Tulsa Transit Authority, who delivered the custody of said $4,392.50 to said defendant for the use of Mtta Bus Company, and which money came into the defendant's care and control by virtue of his said employment, and after receiving the same, said  defendant failed to pay or deliver the same to his said employer and did thereafter with fraudulent intent, willfully, wrongfully and feloniously embezzle, appropriate and convert the sum of $4,392.50 to his own use and benefit and to a use and purpose not in due and lawful execution of his trust,

**(COUNT 2)
21 O.S. 1456**

**KENNETH WAYNE SPEED**, between **8/1/2014** and **11/24/2014**, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **EMBEZZLEMENT BY EMPLOYEE**, a Felony, by unlawfully, feloniously, said defendant, not being an apprentice, nor a person within the age of 18 years, and being then and there the employee of Mtta Bus Company, was entrusted with the sum of $31,188.50, lawfully received from one Tulsa Transit Authority, who delivered the custody of said $31,188.50 to said defendant for the use of Mtta Bus Company, and which money came into the defendant's care and control by virtue of his said employment, and after receiving the same, said defendant failed to pay or deliver the same to his said employer and did thereafter with fraudulent intent, willfully, wrongfully and feloniously embezzle, appropriate and convert the sum of $31,188.50 to his own use and benefit and to a use and purpose not in due and lawful execution of his trust,

**(COUNT 3)
21 O.S. 1456**

**LAWRENCE JEROME MORGAN,** between **8/1/2014** and **11/24/2014**, in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the

---

[2] This statute was repealed in 2002.

crime of **EMBEZZLEMENT BY EMPLOYEE**, a Felony, by unlawfully, feloniously, said defendant, not being an apprentice, nor a person within the age of 18 years, and being then and there the employee of Mtta Bus Company, was entrusted with the sum of $2,205.00, lawfully received from one Tulsa Transit Authority, who delivered the custody of said $2,205.00 to said defendant for the use of Mtta Bus Company, and which money came into the defendant's care and control by virtue of his said employment, and after receiving the same, said defendant failed to pay or deliver the same to his said employer and did thereafter with fraudulent intent, willfully, wrongfully and feloniously embezzle, appropriate and convert the sum of $2,205.00 to his own use and benefit and to a use and purpose not in due and lawful execution of his trust, Contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State.

117.    On March 27, 2015, a preliminary hearing was held before the Honorable Judge

Clifford J. Smith.  At the conclusion of the preliminary hearing, Judge Smith ruled that there was

insufficient evidence to establish the crime of embezzlement, and that the State had failed to

demonstrate criminal intent. Specifically Judge Smith stated:

> …These three were charged because they didn't enter a restitution agreement.
>
> But the evidence before the Court is that there was a policy of printing 2 Ride passes under policy criteria, but drivers were authorized to do so in a prescribed manner for prescribed purposes.
>
> And when they printed these 2 Ride passes, they were printing a coupon of potential value. And they gave testimony to the -- or I say they gave statements to the police and to their employer that they printed them as a matter of convenience for the purpose, as they understood, that seemed violative of the company policy, but they printed them for convenience so they could hand them out and not delay.
>
> There was never any specific statements given that those were ever redeemed. And I think that that proof, in order to establish a value, a dollar amount, or something of worth -- the potential of them to be used I don't think is sufficient to establish the crime.
>
> And I don't think the State has demonstrated criminal intent. I think what's been demonstrated is they were rightly terminated for violation of company policy, but not all terminations for company policy are crimes. And I don't think this is.

(3/27/15, Transcript pp. 83-85)

118.    The State appealed Judge Smith's ruling to the District Court, and a hearing was held before the Honorable Judge Sharon Holmes on April 20, 2015. At the conclusion of the hearing, Judge Holmes overruled the State's appeal motion, and let the Magistrate's ruling stand.

119.    In reaching her decision affirming the dismissal, Judge Holmes stated:

> I also had a problem with how the gentlemen were handled when they were taken into custody. It seemed to me that the police department took on a role that the District Attorney's Office should have been fulfilling by telling these people – and, presumably, they got the permission from MTTA – but by telling these people, "Look, if you can pay, we won't arrest you." That's not their role. And my mindset was if MTTA had been out of that much money or had experienced that big of a loss, they would have been a lot more adamant about pressing charges.

(4/20/15, Transcript, p. 7)

Regarding the passes, the Court stated:

> ... I have to tell both counsel, I read this transcript about four times and I read the MTTA police (sic) manual two or three times… I don't think the manual is clear on how many tickets could be dispensed. And what I think was very telling about the manual, there's a diagram in the back of this manual that shows a button that says **"Free Ride Promotional."** I think that's what these gentlemen were doing, and **there's no guidance on how that Free Ride Promotional issue was supposed to be handled** (emphasis added). I also thought it was very telling that each of them said they were trained to do this. And I think it was reasonable to draw the inference that they had been trained to do this to make the bus company look good.

(emphasis added) (4/20/15, Transcript, p. 6)

In other words, these Plaintiffs, all of them, were subjected to coercive oppression, terminated, arrested, detained, and criminally prosecuted for printing 2 Ride Courtesy Passes all in an effort to make the bus company look good.

120.    On May 11, 2015, MTTA attorney, Stephen C. Andrew with Andrew and Williams, P.C. mailed Plaintiffs Copeland, Morgan and Speed their final paychecks, which MTTA had unlawfully withheld for the five and a half months since their November 24, 2014 termination. MTTA withheld the final paychecks while these Plaintiffs were being maliciously prosecuted.

27

After Judge Holmes affirmed the dismissal of the charges on April 20, 2015, MTTA had no other choice but to send the Plaintiffs their final paychecks.

121.    In the transmittal letter from Attorney Andrew to Plaintiffs' attorney he wrote: "On a separate note, please be advised that if any form of action is brought against Tulsa Transit by your clients, we have been authorized to seek reimbursement for all funds misappropriated by your clients."

122.    The Plaintiffs did not misappropriate any funds, and the criminal charges against these Plaintiffs had been dismissed for want of probable cause; nevertheless, the MTTA continued to threaten legal action against these Plaintiffs should they decide to exercise their constitutional and statutory rights.

## CAUSES OF ACTION

### I.
### 42 U.S.C. § 1981 RACIAL DISCRIMINATORY DISCHARGE

**"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."**

Plaintiffs restate and incorporate paragraphs 1-122, as if set forth fully herein.

123.    All of the Plaintiffs are the victims of racially discriminatory discharge in violation of 42 U.S.C. § 1981.

124.    All of the Plaintiffs are black. Therefore, all of the Plaintiffs are members of a class protected by § 1981.

125.    All of the Plaintiffs were terminated from their positions with the MTTA.  All of the Plaintiffs were qualified for their positions with the MTTA as evidenced by the fact that they had successfully performed their duties for significant periods of time without serious discipline of any kind.

126.   MTTA did not eliminate Plaintiffs' Bus Operator positions after they were terminated.

127.   MTTA, Cartwright, Colbert, and Mulkey all had the intent to discriminate against Plaintiffs on the basis of their race -- black -- because only these Plaintiffs were targeted for coercive oppression, discriminatory termination, arrest, imprisonment, and criminal prosecution, while similarly situated white bus operators were not subjected to such treatment.

128.   The racial discrimination Plaintiffs suffered interfered with their right to the full and equal benefit of all laws and proceedings enjoyed by white citizens, as defined in § 1981.

129.   MTTA, Cartwright, Colbert, and Mulkey abused their power by employing their power under the color of law as an instrument of coercive oppression against these black persons, the Plaintiffs.  MTTA, Cartwright, Colbert, and Mulkey targeted these black persons, the Plaintiffs, with intent to inflict upon the Plaintiffs the maximum amount of discrimination, humiliation, and embarrassment by subjecting them to false arrest, false imprisonment, malicious prosecution, and deprivation of their liberty interest as protected by the Constitution of the United States. No other similarly situated white bus drivers were treated the way Plaintiffs were treated. Colbert testified at the preliminary hearing that the areas affected by the 2 Ride Courtesy Pass scandal were pretty evenly spread throughout all of the bus routes; yet no similarly situated white bus drivers were subjected to the malicious treatment inflicted on the Plaintiffs.

130.   Plaintiffs Copeland, Speed, Morgan, Smith, Drew, and King sustained damages in the form of loss of employment, lost wages, loss of employment opportunities, compensatory damages, damage to their good names, legal fees, loss of consortium, and damage to their reputation and standing in the community.

## II.
## 42 U.S.C. § 1983
## FOURTEENTH AMENDMENT DEPRIVATION OF PROPERTY INTEREST
## <u>WITHOUT DUE PROCESS OF LAW</u>

**Procedural due process protects a citizen from such deprivation unless the decision resulting in the deprivation was preceded by the application of certain procedures ensuring fairness.**

Plaintiffs restate and incorporate paragraphs 1-130, as if set forth fully herein.

131.     All Plaintiffs possessed a property interest in their continued employment as Bus Operators for the MTTA.

132.     When summoned to the MTTA offices none of the Plaintiffs received any prior notice as to the reason they had been summoned to the MTTA offices, nor were they made aware that the property interest they had in their jobs were about to be terminated without due process of law.

133.     Once in Colbert's office, none of the Plaintiffs were presented with any information or evidence that MTTA relied on to terminate their employment.

134.     While in Colbert's office, none of the Plaintiffs were represented, given the opportunity to ask any questions or the given the opportunity to know the evidence that MTTA had to warrant their termination; nor were Plaintiffs afforded the opportunity to submit evidence because none of them were ever told the purpose of the meeting in order to prepare any evidence to submit. Colbert, and the other individuals present in his office, were not impartial and they had already decided that Plaintiffs would be terminated.

135.     Plaintiffs were simply terminated without being afforded any semblance of a fair level of process.

136.     Plaintiffs were all terminated and deprived of the property interest in their continued employment without prior being noticed, having an opportunity for hearing, or having

an impartial tribunal.  Hunter informed some of the Plaintiffs prior to the "due process hearing" of the outcome of the hearing, thus demonstrating that the decision makers had decided the outcome of the process before allowing the Plaintiffs any opportunity to be heard.

137.    Plaintiffs Copeland, Speed, Morgan, Smith, Drew, and King were all denied their procedural due process rights and sustained damages in the form of loss of employment, lost wages, loss of employment opportunities, compensatory damages, damage to their good names, legal fees, loss of consortium, and damage to their reputation and standing in the community.

### III.
### 42 U.S.C. § 1983 MALICIOUS PROSECUTION

**The Tenth Circuit has stated that it is repugnant to the Constitution for government officials to maliciously abuse their positions of trust to induce the criminal justice system to confine and then prosecute innocent people.** *Pierce v. Gilchrist,* **359 F.3d 1279, 1293 (10th Cir. 2004).**

Plaintiffs restate and incorporate paragraphs 1-137, as if set forth fully herein.

### Plaintiffs Copeland, Speed, and Morgan

138.    MTTA, Cartwright, Mulkey, and Colbert caused Plaintiffs Copeland, Speed, and Morgan to be falsely arrested, falsely imprisoned, and maliciously prosecuted all under the color of state law by contacting TPD and making the false allegations that Plaintiffs had stolen and/or embezzled from MTTA and insisting that TPD "take them all to jail."

139.    The felony criminal charge of embezzlement was terminated in favor of Plaintiffs Copeland, Speed, and Morgan when it was dismissed by Tulsa County Magistrate Judge Clifford J. Smith, and that dismissal was affirmed by Tulsa County District Judge Sharon Holmes.

140.    As determined by the court, no probable cause supported the original arrest, continued confinement, and prosecution of Plaintiffs Copeland, Speed, and Morgan.

141.    MTTA, Cartwright, Mulkey, and Colbert acted with malice as evidenced by the fact that Cartwright was heard, on multiple occasions, telling TPD, **"Lock them up, lock them all up!"**

142.    Plaintiffs Copeland, Speed, and Morgan sustained damages in the form of loss of employment, lost wages, loss of employment opportunities, compensatory damages, damage to their good names, legal fees, loss of consortium, and damage to their reputation and standing in the community.

## IV.
## 42 U.S.C. § 1983 FALSE ARREST/IMPRISONMENT

### Deprivations of Plaintiffs' Fourth Amendment Right to be Free from Unreasonable Seizures

Plaintiffs restate and incorporate paragraphs 1-142, as if set forth fully herein.

### Plaintiffs Smith, Drew, and King

143.    On November 24, 2014, Plaintiffs Smith, Drew, and King were unconstitutionally seized when they were detained and arrested due to the false allegations made by MTTA, Cartwright, Mulkey, and Colbert. They were falsely arrested and imprisoned without legal process.

144.    MTTA, Cartwright, Mulkey, and Colbert caused these Plaintiffs to be detained and arrested without probable cause to believe that they had committed a crime.

145.    MTTA, Cartwright, Mulkey, and Colbert knowingly misrepresented material facts to the police to cause Plaintiffs to be detained and arrested.

146.    There was absolutely no reasonable basis to believe that Plaintiffs were guilty of embezzlement, particularly when the Plaintiffs were terminated, detained, and arrested merely for doing the job they had been directed and asked to do, that is dispensing 2 Ride Courtesy Passes to customers in an effort to improve customer satisfaction.

147.    In fact, other MTTA drivers printed off as many, or even more, 2 Ride Courtesy Passes than Plaintiffs but were not targeted for termination, detainment, arrest, and extortion.

148.    MTTA, Cartwright, Mulkey and Colbert instructed law enforcement officials to inform these Plaintiffs that if they did not pay the money demanded (in cash and within an hour), they would be arrested and prosecuted.

149.    MTTA, Cartwright, Mulkey, and Colbert, under the color of law, used the threat of arrest and criminal prosecution to coerce and extort money from Plaintiffs Smith, Drew, and King.

150.    MTTA, Cartwright, Mulkey, and Colbert under the color of law caused Smith, Drew, and King to be confined, imprisoned and extorted to pay money to MTTA.

151.    MTTA, Cartwright, Mulkey, and Colbert's use of the threat of prosecution to induce the payment of money was egregious and qualifies as a deprivation of due process that violates the Fourth Amendment.

152.    This wrongful utilization of the legal process deprived Plaintiffs Smith, Drew, and King of the due process protections afforded by the Fourth Amendment.

153.    After Plaintiffs Smith, Drew, and King were coerced, under threat of prosecution, to pay the money, no criminal charges were initiated.

154.    There was no probable cause to support the Defendants' confinement, imprisonment, and coercion to pay money of Plaintiffs Smith, Drew, and King.

155.    MTTA, Cartwright, Mulkey, and Colbert acted with malice, as evidenced by the Defendants' obvious primary motivation by a desire to coercively abuse the legal process in a perverted attempt to accomplish the ulterior purpose of extorting money from these bus drivers that the Plaintiff bus drivers did not steal or embezzle rather than a legitimate motivation to bring these Plaintiffs to justice if they had in fact committed a crime. Malice is also established by the

lack of probable cause found by Judge Smith and affirmed by Judge Holmes in dismissing the embezzlement charges against Plaintiffs Copeland, Speed, and Morgan. As Judge Holmes stated, "if MTTA had been out of that much money or had experienced that big of a loss, they would have been a lot more adamant about pressing charges." Judge Smith also recognized that: "These three were charged because they didn't enter a restitution agreement." Ironically, had Defendants only sought to prosecute rather than extort money outside of any legal process, Plaintiffs Smith, Drew, and King, if convicted of embezzlement, would have been ordered to pay restitution pursuant to 21 Okla.Stat. § 1451. Instead, Defendants, under the color of law, had Plaintiffs falsely arrested and imprisoned, and in a flagrant display of malice used the police to threaten criminal prosecution to coerce and induce Plaintiffs to make restitution when no restitution was owed. Such behavior is repugnant to the Fourth Amendment constitutional guarantee of due process and constitutes a malicious abuse of the criminal justice system.

156.    Plaintiffs Smith, Drew, and King sustained damages in the form of deprivation of their constitutional due process rights as protected by the Fourth Amendment, actual damages for the money they were coerced to pay for crimes they did not commit, and compensatory damages, as well as loss of employment and lost wages.

## V.
## DEPRIVATION OF LIBERTY INTEREST WITHOUT DUE PROCESS OF LAW IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983

**"An employee has a liberty interest in his good name and reputation as it affects his protected property interest in continued employment."**

Plaintiffs restate and incorporate paragraphs 1-156, as if set forth fully herein.

**Plaintiffs Copeland, Speed, and Morgan**

157.    MTTA, Cartwright, Mulkey, and Colbert either made, authorized, or knowingly failed to correct false published statements that impugned the good names, honor and integrity of Plaintiffs Copeland, Speed, and Morgan.

158.    All of the information that was published to the media regarding Plaintiffs Copeland, Speed, and Morgan was knowingly false, and made public with the purpose and intent to inflict maximum damage to the Plaintiffs' good name, reputation, honor, and integrity. For example, these plaintiffs had their photographs published in the newspaper under the headline:



Posted: Thursday, November 27, 2014 12:00 am

By SAMANTHA VICENT World Staff Writer |

Three Tulsa Transit bus drivers arrested for alleged embezzlement

■ Nearly $38,000 in bus coupons were printed, officials say.

 Copeland      Kenneth Speed      Morgan

http://www.tulsaworld.com/news/crimewatch/three-tulsa-transit-bus-drivers-arrested-for-alleged-embezzlement/article_3dbb4df7-1309-5f6e-bac8-3b68891ccbf9.html#user-comment-area     (last visited October 10, 2015).

The allegation that these Plaintiffs were embezzlers for merely printing 2 Ride Courtesy passes, as they had been directed to do, was known to the Defendants to be patently false.

159.    During these Plaintiffs' preliminary hearing on March 27, 2015, Defendant Colbert testified, in response to a question from Judge Smith, that there was no way to determine if any of the passes that were generated by these [Plaintiffs] were ever redeemed. Defendant Colbert also testified that it had not been determined that any of the passes were utilized to obtain a free ride.

In fact, Colbert testified that all six Plaintiffs were terminated for giving away too many passes.

Significantly, Colbert's sworn testimony contradicts Cartwright's repeated statements to the police

detectives that Plaintiffs "fraudulently printed off bus coupon[s] from the fair box system." (See

Paragraphs 78, 92, & 109) Therefore, the Defendants all knew that the Plaintiffs were terminated,

not for embezzlement, but for merely printing off what Defendants believed to be too many passes.

Defendants knew that none of the Plaintiffs had committed the felony crime of embezzlement, but

Defendants induced the criminal justice system to prosecute, and allowed the media to report,

without correction or clarification, defamatory headlines such as:

## Tulsa Transit Estimates Drivers Embezzled Almost $38,000

*Posted: Nov 26, 2014 5:29 PM CST  Updated: Nov 26, 2014 5:29 PM CST*

http://www.newson6.com/story/27492084/tulsa-transit-estimates-drivers-embezzled-almost-38000 (last visited October 20, 2015)

## 6 Tulsa Transit bus drivers accused of stealing fares

**POSTED:** 10:17 PM, Nov 25, 2014

http://www.kjrh.com/news/local-news/6-tulsa-transit-bus-drivers-accused-of-stealing-fares(last visited October 20, 2015)

## Tulsa Transit Drivers Accused of Embezzlement

Posted: 4:54 p.m. Tuesday, Nov. 25, 2014

http://www.fox23.com/news/news/local/tulsa-transit-drivers-accused-embezzlement/njF6n/(last visited October 21, 2015)

160.    MTTA, Cartwright, Mulkey, and Colbert provided the media with statements

regarding Plaintiffs Copeland, Morgan, and Speed which they knew to be false in the course of

terminations of Plaintiffs Copeland, Morgan, and Speed which MTTA, Cartwright, Mulkey, and

Colbert caused based upon manufactured allegations of wrongdoing.

161.    MTTA, Cartwright, and Colbert conspired and filed bogus insurance claims with CHUBB Insurance Company falsely claiming that Plaintiffs Copeland, Morgan, and Speed stole courtesy passes.

162.    As a result of the false claim, Plaintiffs Copeland, Morgan, and Speed received menacing letters from CHUBB Insurance Company threatening Plaintiffs Copeland, Morgan, and Speed with legal action if Plaintiffs Copeland, Morgan, and Speed did not reimburse CHUBB Insurance Company for the $30,000 that it paid MTTA.

**Plaintiffs Smith, Drew, and King**

163.    MTTA, Cartwright, Mulkey, and Colbert either made, authorized, and knowingly failed to correct statements that impugned the good names, reputations, honor and integrity of Plaintiffs Smith, Drew, and King.

164.    The false information stigmatizing and impugning Smith, Drew, and King's good name, reputation, honor, and integrity was published in the Tulsa Police Department supplemental officer report where Plaintiffs Drew, King, and Smith were identified as uncharged defendants, and to the Oklahoma Employment Security Commission ("OESC") when these Plaintiffs pursued their unemployment claims. In this case, Mulkey mailed the knowingly false newspaper articles regarding these Plaintiffs to the OESC thereby publishing them.

165.    Plaintiffs Smith, Drew, and King sustained damages in the form of loss of employment, lost wages, loss of employment opportunities, compensatory damages, damage to their good names, legal fees, loss of consortium, and damage to their reputation and standing in the community.

## VI.
## 42 U.S.C. § 1985(3) CONSPIRACY TO INTERFERE WITH THE CIVIL RIGHTS

**"If two or more persons in any State or Territory conspire… for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;…the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."**

Plaintiffs restate and incorporate paragraphs 1-165, as if set forth fully herein.

166.    Title 42 U.S.C. § 1985(3) prohibits persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

167.    The conspiracy involved Cartwright, Colbert, and Mulkey, on or before November 24, 2014, meeting, discussing, agreeing, and conspiring to falsely accuse Plaintiffs of theft and embezzlement for merely printing off 2 Ride Courtesy Passes in amounts that Defendants arbitrarily decided was too high. Defendants had no information, evidence, or even an accusation that Plaintiffs had stolen, sold, or converted the 2 Ride Courtesy Passes for their own personal use. However, after conspiring with the other Defendants, Cartwright nevertheless contacted the TPD for the purpose of utilizing its law enforcement powers under the color of law to deprive Plaintiffs of equal privileges and immunities that are protected under the United States Constitution, specifically the Fourth and the Fourteenth Amendments.

168.    The acts in furtherance of the conspiracy involved Colbert falsely reporting that the Plaintiffs received due process, and Cartwright having Plaintiffs detained and arrested at the MTTA. Then Plaintiffs were handcuffed and transported to the TPD Station, where they were each confronted with the coercive ultimatum to either pay money in cash to the MTTA or go to jail and be prosecuted.

169.    The arrest, detainment, and ultimatum was for conduct that MTTA encouraged all bus drivers to do; that is, print out 2 Ride Courtesy Passes and distribute them to customers at the bus driver's discretion to promote customer satisfaction.

170.    This conspiracy was motivated by an invidious discriminatory animus against blacks in general; these six black bus drivers in particular, who were painted with the stereotypical brush of bias and prejudice that all blacks are thieves, embezzlers and crooks. The discriminatory animus against blacks in general and these black Plaintiffs was demonstrated by Defendants' failure to conduct an investigation, failure to afford Plaintiffs any due process, failure to treat similarly-situated white bus drivers the same as the Plaintiffs, and the targeting of the Plaintiffs with the coercive oppression of the legal process to extort money from them while at the same time conspiring to exert the maximum deprivation of their civil rights as protected by the United States Constitution.

171.    Just prior to the Plaintiffs being summoned to the MTTA, there was a meeting of the minds, a conspiracy, and agreement among the Defendants to deprive the Plaintiffs of their constitutional and statutorily protected civil rights because while detained at the MTTA, and after the Plaintiffs had been arrested, Cartwright was overheard yelling, "Take them to jail! Take them all to jail!" While at the Tulsa jail, the Tulsa police detectives who spoke with the Plaintiffs, told each of them that Cartwright had directed the Hobson's choice they were being presented. In other words, the police department had conspired with Cartwright, Mulkey, and Colbert; they all acted in concert to knowingly deprive Plaintiffs of their constitutional rights.

172.    Plaintiffs Copeland, Morgan, Speed, Smith, Drew and King sustained damages in the form of loss of employment, lost wages, loss of employment opportunities, compensatory

damages, damage to their good names, legal fees, loss of consortium, and damage to their reputation and standing in the community.

## VII.
## VIOLATION OF 40 O.S. § 165.3
## <u>FAILURE TO PAY WAGES</u>

**"Whenever an employee's employment terminates, the employer shall pay the employee wages in full."**

Plaintiffs restate and incorporate paragraphs 1-172, as if set forth fully herein.

173.    Pursuant to the provisions of the Oklahoma Protections of Labor Act, specifically 40 O.S. § 165.3, an employer who fails to pay all wages owed to an employee when due shall be held liable to the employee for liquidated damages in the amount of two percent (2%) of the unpaid wages per day, up to one-hundred percent (100%) of the unpaid wages.  However, the employer will not be held liable for liquidated damages if the employer (1) gives written notice to the employee of the amount of wages the employer concedes is owed, and (2) pays the employee the undisputed amount. *Campbell v. Independent School Dist. No. 01 of Okmulgee,* 2003 OK 73, ¶ 21

174.    Plaintiffs King, Smith, Copeland, Speed, and Morgan were owed wages and benefits through November 24, 2014.

175.    MTTA did not pay King wages and benefits owed from November 24, 2015 until on or about January 1, 2015.

176.    MTTA did not pay Copeland, Speed, and Morgan wages and benefits owed from November 24, 2015 until on or about May 11, 2015.

177.    MTTA did not provide King, Copeland, Speed, and Morgan with any notice that there was a "bona-fide disagreement" of the amount of wages owed.

178.    MTTA did not provide King, Copeland, Speed, and Morgan with written notice of the amount of wages MTTA conceded it owed.

179.    MTTA did not pay King, Copeland, Speed, and Morgan any undisputed amount.

180.    In the letter by which MTTA transmitted its partial payment to Copeland, Speed, and Morgan, MTTA through its attorney, Stephen Andrews of Andrews and Williams, P.C., threatened that "if action is brought against Tulsa Transit by your clients [Morgan, Speed, and Copeland], [Andrews and Williams, P.C.] have been authorized to seek reimbursement for all funds misappropriated by [Morgan, Speed, and Copeland]."

181.    To date, MTTA has not paid Copeland, Speed, and Morgan all of their accrued sick and/or vacation leave.

182.    Plaintiffs seek all wages and benefits yet unpaid, liquidated damages in the amount of two percent of wages and benefits that were not timely paid, and attorney fees.

183.    Title 40 O.S. § 165.8 declares that it shall be a misdemeanor for any employer to violate any of the provisions of the Oklahoma Protections of Labor Act. Therefore, MTTA violated the law, not Plaintiffs.

## VIII.
## EXEMPLARY DAMAGES

Plaintiffs restate and incorporate paragraphs 1-183, as if set forth fully herein.

177.    Defendants Cartwright's, Colbert's, and Mulkey's actions and omissions in violating Plaintiffs' Constitutional and federal civil rights as alleged above in the seven causes of actions were malicious, willful, and in gross disregard of Plaintiffs' constitutionally protected rights.

178.    In order to punish Cartwright, Colbert, and Mulkey for engaging in unlawful practices and deter comparable actions and omissions in the future, Plaintiffs should be award exemplary/punitive damages.

## PRAYER FOR RELIEF

Plaintiffs, Justin Copeland, Lawrence Morgan, Kenneth Speed, John B. Smith, Beverly Drew, and Leroy King pray that this Honorable Court enter judgment in their favor and against Defendant Metropolitan Tulsa Transit Authority, William Cartwright, Michael Colbert, and Debbie Mulkey jointly and severally, and award Plaintiffs relief as follows:

1.     Declaratory relief declaring that Defendants deprived Plaintiffs of their constitutional and federally protected civil rights.

2.     All actual damages, including lost back-pay and benefits resulting from Defendants' discriminatory conduct.

3.     Reimbursement of the monies that were extorted from Smith, Drew, and King.

4.     Reinstatement, or in lieu of reinstatement, front pay.

5.     Compensatory damages to compensate Plaintiffs for damages they sustained as a result of the deprivations of their constitutionally and federally protected civil rights.

6.     Loss of consortium.

7.     Exemplary/punitive damages against Cartwright, Colbert, and Mulkey.

8.     All costs of these proceedings, including but not limited to, attorney fees pursuant to 42 U.S.C. § 1988(b); prejudgment and post-judgment interest; and withheld and unpaid wages and benefits plus interest thereon as provided by 40 Okla.Stat. § 165.3.

9.     Any and all other relief the Court deems appropriate.

Respectfully submitted,

RIGGS, ABNEY, NEAL, TURPEN,
  ORBISON & LEWIS


/s/ Melvin C. Hall                                                    
Melvin C. Hall, OBA No. 3728
528 NW 12th Street
Oklahoma City, Oklahoma  73103
Telephone:  (405) 843-9909
Facsimile:   (405) 842-2913
Email:                   mhall@riggsabney.com

-and-


 /s/ Damario Solomon-Simmons                          
Damario Solomon-Simmons, OBA No. 20340
502 West 6th Street
Tulsa, Oklahoma 74119
Telephone:  (918) 587-3161
Facsimile:   (918) 587-9708
Email:                   dsimmons@riggsabney.com

ATTORNEYS FOR PLAINTIFFS


**Attorney Lien Claimed**
**Jury Trial Demanded**